ROB BONTA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
MARK R. BECKINGTON
LAURA L. FAER
VILMA PALMA-SOLANA
Supervising Deputy Attorneys General
JULIA HARUMI-MASS
SOPHIA CARRILLO
HEIDI JOYA
KANWALROOP KAUR SINGH
State Bar No. 189649
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA 94612-0550
  Telephone: (510) 879-3300
  Fax: (510) 622-2270
  E-mail: Julia.Mass@doj.ca.gov
*Attorneys for California Secretary of State*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALLIANCE FOR FAIR BOARD RECRUITMENT,**<br><br>Plaintiff,<br><br>v.<br><br>**SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,**<br><br>Defendant. | 2:21-cv-05644-RGK (RAOx)<br><br>**DECLARATION OF ANDREW JENNINGS IN SUPPORT OF DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS COMPLAINT**<br><br>Date: November 1, 2021<br>Time: 9:00 a.m.<br>Courtroom: Courtroom 850, 8th Floor<br>Judge: Honorable R. Gary Klausner<br>Trial Date: none set<br>Action Filed: July 12, 2021 |

# DECLARATION OF ANDREW JENNINGS

I, Andrew Jennings, declare:

1. I am over the age of 18 years and a U.S. citizen. I know the following facts based on my own personal knowledge, and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

## Background and Experience

2. I hold an M.A. in economics and a J.D. from Duke University. I am a member of the bars of New York and North Carolina.

3. As of July 2021, I am an assistant professor of law at Brooklyn Law School in Brooklyn, New York, where I teach business-law courses.

4. My recent and current scholarly research is in the fields of corporate governance, corporate crime and compliance, federalism in corporate and securities laws, and securities enforcement. I have authored five scholarly works in these fields that have been published or are accepted for publication: *State Securities Enforcement*, 47 BYU L. Rev. __ (forthcoming 2021); *Follow-Up Enforcement*, 70 Duke L.J. 1569 (2021); *Notice Risk and Registered Agency*, 46 J. Corp. L. 75 (2021); *Shareholders United?*, 95 Notre Dame L. Rev. Reflection 47 (2019); and *Firm Value and Intracorporate Arbitration*, 38 Rev. Litig. 1 (2018).

5. Specifically, my works *Shareholders United?* and *Firm Value and Intracorporate Arbitration* concern the powers of shareholders in corporate governance.

6. I am in the midst of a research series focused on internal decision-making and policy development within public corporations. The first article in the series, *Disclosure Procedure*, is a publicly available empirical study of how public companies prepare their Securities and Exchange Commission ("SEC") filings and other disclosures. A summary of this article has been published on Columbia Law School's *Blue Sky Blog*, a widely read publication on corporations and the capital markets that serves as a forum for scholars, practitioners, and regulators.[1]

---

[1] Andrew Jennings, *Disclosure Procedure*, CLS BLUE SKY BLOG (Sept. 13, 2021), https://clsbluesky.law.columbia.edu/2021/09/13/disclosure-procedure/.

7. In June 2021, I presented a lecture on *Disclosure Procedure* as part of Moody's Investors Service's outside speaker series and I shared my findings as part of a panel on disclosure-committee practices at the annual conference of the Society for Corporate Governance, a professional association for corporate secretaries and in-house counsel.

8. My scholarly research uses both interview and survey methods, which allows me to speak to corporate-governance professionals at a broad range of public companies about the internal workings of their firms. These professionals include general counsels and other in-house lawyers, senior and junior financial and accounting officials, and investor-relations professionals. Through these conversations and prior professional experiences, I have gained insight into the competing pressures that help shape corporate-governance decisions.

9. Related to my work as a law professor, I am the creator and host of the *Business Scholarship Podcast*, a free, publicly available podcast in which I interview business scholars about their recent research. The podcast currently has over 126 episodes and is intended to promote the dissemination of business scholarship and to promote discourse between academics and practitioners in relevant fields, including law, finance, management, accounting, and journalism.

10. Prior to joining the Brooklyn Law School faculty, I was a lecturer in law at Stanford Law School, where I served as the teaching fellow for the LL.M. Program in Corporate Governance & Practice. In this role I taught courses on corporate governance and conducted research in the areas of corporate governance, corporate crime and compliance, and securities regulation.

11. Before entering legal academia, I worked for Cravath, Swaine & Moore LLP ("Cravath"). I practiced in the firm's mergers-and-acquisitions and corporate-governance practices; my practice included representing public companies in a variety of corporate-governance matters, including preparation of proxy statements and other SEC filings; annual shareholder meetings and shareholder voting; shareholder proposals and activism; functions of boards of directors ("boards") and their committees; and internal investigations of potential governance or compliance issues.

12. Following my time at Cravath, I served as a law clerk to Hon. Helene White, U.S. Court of Appeals for the Sixth Circuit. After my clerkship I joined Sullivan & Cromwell LLP ("S&C"). At S&C, I practiced primarily in the area of criminal defense and investigations, with my practice being focused on representing public companies in internal investigations and governmental investigations or enforcement, including by the SEC.

13. My education, professional background, and publications are described in additional detail in my curriculum vitae, which is attached hereto as **Exhibit 1**.

## Introduction

14. This declaration addresses how directors of public companies are nominated, appointed, and elected.

15. This declaration addresses the power and practice of boards to unilaterally expand their size.

## Methodology and Research

16. The SEC maintains the Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system for the filing of securities-offering registration statements, periodic reports, other disclosures by public companies, and other filings. *See* Regulation S-T, 17 C.F.R. § 232.100. EDGAR is freely accessible to the public on the SEC's website and filings by companies or others become publicly available immediately or soon after they are electronically submitted. Commercial services, such as LexisNexis Securities Mosaic and Bloomberg Law, provide "value-added" services that allow practitioners and scholars to conduct more granular searches and analytics of documents filed via EDGAR than the SEC's public EDGAR portal supports. In the fields of corporate practice and corporate-governance research, EDGAR is considered the authoritative source for accessing various mandatory securities disclosures.

17. Among those mandatory disclosures are proxy statements and disclosures reporting results of elections. Under 15 U.S.C. § 78n and SEC Regulation 14A, anyone seeking voting authority from another in connection with a shareholder election must file a proxy statement on Schedule 14A. Proxy statements must include certain disclosures and identify means for shareholders to vote on voting items such as the election of directors. *See* Regulation 14A, 17

C.F.R. § 240.14a-4. Companies must announce the results of elections within four days of a meeting of shareholders on a Current Report on Form 8-K ("Form 8-K").[2] Companies must also report on Form 8-K, if, for example, a director has resigned or the board has made an appointment to a seat pending the next shareholder election.[3] Prior to 2010, election results were reported on the Quarterly Report on Form 10-Q ("Form 10-Q") for the quarter in which the shareholder meeting occurred.[4] Although not the primary purpose of such disclosures, these filings facilitate corporate-governance research and have informed my understanding of board governance.

18. Under Section 12 of the Securities Exchange Act of 1934, a company becomes "public" once it has hit one of three triggers: (1) it has issued securities on a national securities exchange, such as the New York Stock Exchange;[5] (2) it has total assets exceeding $10 million *and* 2,000+ shareholders or 500+ unaccredited investors;[6] or (3) it makes a public offering under the Securities Act of 1933.[7]

19. A public company must indicate on the coversheets of its Forms 8-K and 10-Q, as well as its Annual Reports on Form 10-K ("Form 10-K"), the name of each securities exchange on which its securities are listed. Although not the primary purpose of such disclosures, these filings facilitate corporate-governance research and have informed my understanding of board governance.

20. Public companies must file with the SEC their articles/certificates of incorporation ("charters") and bylaws whenever they file registration statements or periodic reports, provided that they may incorporate by reference charters or bylaws that were previously filed. *See* Regulation S-K, 17 C.F.R. § 229.601. Although not the primary purpose of such disclosures, these filings facilitate corporate-governance research and have informed my understanding of board governance.

---

[2] *See* SEC, Current Report on Form 8-K, Item 5.07 (expiring Sept. 30, 2021), https://www.sec.gov/files/form8-k.pdf.
[3] *See id.* at Item 5.02.
[4] *See* SEC, Proxy Disclosure Enhancements, Release Nos. 33-9089; 34-61175; IC-29092; File No. S7-13-09, at 61–63 (Dec. 16, 2009) (explaining the transition from Form 10-Q to Form 8-K election-result reporting).
[5] 15 U.S.C. § 78l(a).
[6] *Id.* at § 78l(g).
[7] *Id.* at § 78l(f)(1)(G).

21. In preparing my declaration, I consulted empirical studies, cited herein, that employ, among other sources, information contained in public-companies' SEC filings. Such studies are authorities in corporate-governance research.

22. In preparing my declaration, I also consulted law-firm materials, cited herein. Corporate law firms commonly prepare materials that they send to prospective and current clients, which are typically also published on their websites. These materials reflect law firms' monitoring of corporate-governance developments and the kinds of services and advice they are prepared to offer in connection with those developments. They are thus reflective of market practice around corporate governance.

## Discussion and Analysis

### A. Shareholders Largely Lack Power Over Director Nominations and Elections

#### I. How Directors Are Elected

23. Plurality voting is a traditional method of electing directors followed by many public companies. Under plurality voting, for a given number, *n*, of available board seats, the *n* nominees who receive the highest number of votes are elected. For example, if a board has seven seats and nine nominees, the seven nominees with the highest number of votes will be elected. Such an election in which there are fewer seats than nominees is a "contested election." But if the board has seven seats and seven nominees, then all the nominees will be elected. That result would hold even if a nominee received only a single vote. Such an election in which the number of seats is equal to the number of nominees is an "uncontested election."

24. Under the plurality-voting method, a shareholder may vote "for" all or some of the nominees, may withhold a vote for all or some of the nominees, or may not give director-election voting instructions on the proxy card. In the case of an uncontested election, however, all nominees will be elected so long as they receive at least one vote.

25. In addition to the plurality-voting method, there are multiple majority-voting methods. In general, these methods require that directors standing for reelection in an uncontested election receive more "for" votes than "against." At most companies that have adopted a majority-

voting method, however, the board itself makes the final decision whether a director who receives more "against" than "for" votes in an uncontested election will continue to serve as director.

26. A substantial majority of public-company shares are not held directly by shareholders, but rather they are held and voted through a complex system of nominee holders, custodial banks, and brokerage firms. Shares held in this system are voted by intermediaries on behalf of the shares' beneficial owners, who might be pension and mutual funds, insurance companies, hedge funds, individuals, or other investor types. Such shares are said to be held in "street name" because they are legally titled to Cede & Co., an affiliate of Depository Trust Company ("DTC"). DTC serves as the central securities depository for U.S. securities markets. For shares held in street name, investors exercise their franchise by instructing brokers how to vote their shares. Under New York Stock Exchange Rule 452,[8] member brokerages may not vote in director elections without receiving voting instructions from beneficial owners, although they may vote on routine matters such as ratifying the appointment of the company's independent auditor. Thus, for some voting items—such as the election of directors—brokers may return proxy cards without votes, that is, "broker non-votes."[9]

27. For Delaware corporations—where many public companies are incorporated regardless their principal business locations—by default a majority of voting securities being "present or represented by proxy" at a shareholder meeting constitutes a quorum. Del. Gen. Corp. L. § 216. Individual companies may set quorum as low as one third of voting securities. *Id.*

28. As I note in Paragraph 26, brokers will not vote in elections without receiving voting instructions from beneficial owners, and thus in a director election the number of votes cast "for" or "withhold/against" nominees may be thousands or millions fewer than the number of shares eligible to be voted. These broker non-votes nevertheless contribute to the presence of a quorum

---

[8] NEW YORK STOCK EXCHANGE R. 452, https://nyseguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B4A07B716-0F73-46CC-BAC2-43EB20902159%7D--WKUS_TAL_19401%23teid-375.

[9] *See generally* Marcel Kahan & Edward B. Rock, *The Hanging Chads of Corporate Voting*, 96 GEO. L.J. 1227 (2008).

because the shares are "represented by proxy" for routine matters that do not require beneficial-owner instructions.

29. Institutional shareholders typically collectively hold a significant portion of a public company's shares, if not an outright majority. Their collective voting power is significant in part because many institutional investors, including the biggest institutional investors—BlackRock, State Street Global Advisors, and The Vanguard Group—expressly support board gender diversity.[10]

---

[10] See Sarah Krosue, *BlackRock: Companies Should Have at Least Two Female Directors*, WALL ST. J. (Feb. 2, 2018), https://www.wsj.com/articles/blackrock-companies-should-have-at-least-two-female-directors-1517598407; BlackRock, Inc., BlockRock Investment Stewardship: Proxy Voting Guidelines for U.S. Securities, at 6 (eff. Jan. 2021), https://www.blackrock.com/corporate/literature/fact-sheet/blk-responsible-investment-guidelines-us.pdf ("In addition to other elements of diversity, we encourage companies to have at least two women directors on their board."); State Street Corporation, SSGA's Guidance on Enhancing Gender Diversity on Boards, at 2 (Mar. 7, 2017), https://web.archive.org/web/20170409231526/https://www.ssga.com/investment-topics/environmental-social-governance/2017/guidance-on-enhancing-gender-diversity-on-boards.pdf ("In the event that companies fail to take action to increase the number of women on their boards, despite our best efforts to actively engage with them, we will use our proxy voting power to effect change — voting against the Chair of the board's nominating and/or governance committee if necessary."); F. William McNabb III, Chairman and Chief Executive Officer, The Vanguard Group, Inc., An Open Letter to Directors of Public Companies Worldwide, at 2 (Aug. 31, 2017), https://global.vanguard.com/documents/investment-stewardship-mcnabb-letter.pdf ("Gender diversity is one element of board composition that we will continue to focus on over the coming years."); The Vanguard Group, Inc., Vanguard Investment Stewardship Insights, A Continued Call for Boardroom Diversity, at 1 (Dec. 2020), https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/ISBOARD_122020.pdf ("But when we see a lack of commitment to progress on diversity—for example, a board lacking any gender diversity or any racial or ethnic diversity—we become concerned that long-term shareholder returns may suffer."); *id.* ("Beginning at 2021 annual meetings, the Vanguard funds may vote against directors at companies where progress on board diversity falls behind market norms and expectations. In such cases, we may hold nominating committee chairs or other relevant directors accountable."); *see also* Janus Henderson Investors, Proxy Voting Policy and Procedures, at 10 (Mar. 2021), https://2deaa804a6dc693855a0-eba658c6bc03668a61900f643427d64d.ssl.cf1.rackcdn.com/Documents/legal%20documents/JHI%20Proxy%20Voting%20Policy%20and%20Procedures%202021.pdf ("After taking into consideration country-specific practices, Janus Henderson Investors will generally vote in favor of individual director candidates unless they: . . . are the chair of the nominating committee, or are otherwise responsible for the nomination process, of a board that does not have any female directors, and the company has not provided a reasonable explanation for its lack of gender

(continued…)

30. In a typical public company, the directors and executive officers collectively own a meaningful number of shares, even if that collective holding is lower than the 5% mark (i.e., the percentage threshold at which shareholders must disclose their holdings on forms filed with the SEC).[11] A company's directors and executive officers typically vote in accord with the board's proxy recommendations.

### II. How Directors Are Appointed and Nominated

31. Shareholder elections are almost always uncontested.[12] Uncontested elections occur when the number of seats available on the board equals the number of nominees the board has put forward. In uncontested elections, boards themselves select the nominees for whom shareholders may vote or from whom they may withhold votes. Nominees may be incumbent directors or new individuals chosen to join the board.

32. In evaluating whom to nominate in light of their overall complement of members, boards—and in particular, their nominating committees—must hew to regulatory constraints. For instance, both the New York Stock Exchange and the Nasdaq require boards of listed companies to have a majority of "independent directors," with "independence" determinations being subject to complex rules.[13] Such constraints sometimes extend to board committees. For example, audit committees must be comprised of three or more "independent directors," who must also meet certain requirements for financial or accounting experience, sophistication, or knowledge.[14] Such regulatory constraints on board composition also arise outside the heartland of corporate and

---

diversity . . . ."); Dimensional Fund Advisors, 2020 Annual Stewardship Report, at 15 (Oct. 2020), https://my.dimensional.com/dfsmedia/f27f1cc5b9674653938eb84ff8006d8c/43993-source/options/download/2020-annual-stewardship-report.pdf ("An additional consideration that may lead Dimensional to scrutinize the effectiveness of a portfolio company's board refreshment process is a lack of gender diversity on the board.").
[11] Schedule 14A, Item 6(d), 17 C.F.R. § 240.14a-101 (incorporating Item 403, Regulation S-K, 17 C.F.R. § 229.403).
[12] For instance, one study counted contested elections from 1999 to 2008, finding that there were a little under 40 per year on average, out of thousands of public-company elections. *See* Lee Harris, *Missing in Activism: Retail Investor Absence in Corporate Elections*, 2010 COLUM. BUS. L. REV. 104, 120–21 (2010) (presenting original findings and comparing those findings to other empirical studies).
[13] *See* NEW YORK STOCK EXCHANGE, LISTED COMPANY MANUAL §§ 303A.01, 303A.02 [hereinafter "NYSE MANUAL"]; THE NASDAQ STOCK MARKET RULES R. 5065(b) [hereinafter "NASDAQ RULES"].
[14] *See* NYSE MANUAL § 303A.07; *see also* NASDAQ RULES R. 5065(c).

securities law. For example, under the Jones Act, boards of companies that operate domestic maritime vessels must be constituted such that any directors who are not U.S. citizens comprise a minority of the board's quorum. 46 U.S.C. § 12103(b)(4); 46 C.F.R. §§ 67.39(a), 221.3(c)(2). Those kinds of non-securities-regulation constraints on a given company's board composition might not appear so obvious to outside observers. In 2013, for example, *The Wall Street Journal* reported that Goldman Sachs Group, Inc. increased its board quorum to account for its ratio of citizen/noncitizen directors.[15] Although Goldman Sachs is best known as a financial-services institution, it had acquired two Hudson River ferry boats to run between its downtown Manhattan and Jersey City office buildings, requiring it to conform its corporate governance to the Jones Act requirement.[16]

33. Director vacancies sometimes occur between annual or special shareholder meetings, whether because a director has resigned, passed away, or been removed before the expiration of his or her term, or because the board has added new seats. Boards have authority to fill those vacancies via appointment until the seat next comes up for election. *See* Del. Gen. Corp. L. § 223(a)(1) (providing for incumbent directors to fill via appointment "[v]acancies and newly created directorships"). The same kinds of considerations discussed in Paragraph 32 arise when boards make director appointments.

**B. Boards Typically Have Unilateral Authority to Expand Themselves**

34. The number of seats on a public-company board is generally governed by a company's bylaws. For example, under the corporate law of Delaware, "[t]he number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the [charter] fixes the number of directors, in which case a change in the number of directors shall be made only by amendment of the [charter]." Del. Gen. Corp. L. § 141(b). Whether the number of seats is governed by the bylaws or by the charter reflects how much flexibility a board has in adjusting its own size. That is because public-company charters generally empower boards to amend company bylaws. *See* Del. Gen. Corp. L. § 109(a) (permitting a corporation, through its charter, to "confer the power to

---

[15] Brett Philbin, *Goldman Sails Around Maritime Law*, WALL ST. J. (May 30, 2013), https://www.wsj.com/articles/BL-MBB-2092.
[16] *Id.*

adopt, amend or repeal bylaws upon the directors"). These provisions enable boards to unilaterally add or subtract seats by an amendment to the bylaws or by a board resolution without shareholder approval.[17] Boards might have a wide array of business purposes for expanding their size. Those purposes might include bringing new expertise, background, or diversity into the boardroom;[18] managing succession planning; consummating a merger transaction;[19] obtaining financing;[20] complying with requirements imposed by state law, SEC regulations, stock-exchange rules, or other regulations;[21] and settling demands of activist investment funds.[22]

## Conclusions

### A. Shareholders Usually Have No Direct Say in Board Membership via Director Nominations or Elections

35. Elections of public-company directors are unlike elections that occur for public office, for union or association leadership, or in other democratic contexts. In practice, boards themselves almost always determine who is nominated such that the typical director election is uncontested. Although shareholders may "withhold" their votes as a signal of dissatisfaction, with the plurality-voting method and uncontested slates, the outcome—that all nominees will be elected—is predetermined. Even in companies that use some form of majority voting for

---

[17] See Geeyoung Min, *Shareholder Voice in Corporate Charter Amendments*, 43 J. CORP. L. 289 (2018).

[18] For example, Vanguard, one of the largest institutional investors, has suggested that boards expand themselves in order to recruit directors who will contribute to greater boardroom diversity. The Vanguard Group, Inc., Vanguard Investment Stewardship Insights, A Continued Call for Boardroom Diversity, at 2 (Dec. 2020), https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/ISBOARD_122020.pdf ("Boards should consider deliberately expanding in service of greater diversity. Competition for directors can be fierce, and companies should act opportunistically when they identify highly qualified diverse candidates. We would expect a board to readjust its size as appropriate at a later time.").

[19] See, e.g., Devon Energy Corporation, Devon Energy and WPX Energy Complete Merger of Equals Transaction (Jan. 7, 2021), https://www.devonenergy.com/news/2021/Devon-Energy-and-WPX-Energy-Complete-Merger-of-Equals-Transaction (announcing the merger of Devon Energy and WPX Energy and the combining of their boards).

[20] See Hillary H. Holmes & Eric Scarazzo, Capital Raising in the Current Environment I: PIPEs, Gibson, Dunn & Crutcher LLP (June 18, 2020) (recognizing that board representation is a typical component of private-investment-in-public-equity transactions), https://www.gibsondunn.com/webcast-capital-raising-in-the-current-environment-i-pipes/.

[21] *E.g., supra* at ¶ 32.

[22] See Francis J. Aquila, *Negotiating a Settlement with an Activist Investor*, PRACTICAL L.J. 25 (Apr. 2015), https://www.sullcrom.com/files/upload/Apr15_InTheBoardroom.pdf (noting that boards are sometimes expanded as part of settlements with activist investors).

uncontested elections, the board will generally make the final decision whether an incumbent director who fails to receive a majority vote will nevertheless continue to serve as director.

### B. Public-Company Boards Generally Have Authority to Expand Themselves

36. Market practice for public companies is to maintain adequate governance flexibility by allowing boards to amend company bylaws—which encompasses augmenting the size of the board itself—without seeking shareholder approval. There are numerous reasons for adding seats to a board and boards are generally free, in their business judgment, to pursue those purposes by unilaterally adding one or more seats. Boards may also fill those seats by appointment pending the next shareholder election.

I declare under penalty of perjury under the laws of the State of California and the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 2, 2021, in Jersey City, New Jersey.

DATED: October 2, 2021

*Andrew Jennings*
Andrew Jennings